Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Stephanie Van Marter
Richard R. Barker
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW GUDINO-PENA,<br><br>Defendant. | 2:21-CR-00142-TOR-4<br><br>United States' Sentencing Memorandum |

The United States of America, by and through U.S. Attorney Vanessa R. Waldref and Assistant United States Attorneys Stephanie Van Marter and Richard R. Barker, submits the following sentencing memorandum. For the reasons set forth below, the United States respectfully requests that the Court sentence Defendant Matthew Gudino-Pena to a period of incarceration of 204 months, followed by a 10-year term of supervised release.

### INTRODUCTION

In spring and summer 2021, Defendant and the drug trafficking organization to which he belonged – the "Fetty Bros" – used snapchat and other social media to locate a source of supply originating in Mexico. Members of the conspiracy then traveled to Arizona and beyond to be obtain deadly Fentanyl pills (and other drugs) in 10,000-pack quantities, and poured those drugs into this community and others.

United States' Sentencing Memorandum for Matthew Gudino-Pena - 1

As they did so, Defendant engaged in a violent lifestyle without remorse or concern for the impact of his actions on his community or on those who used the organization's deadly drugs. When a customer overdosed, Co-Defendant Carr indicated that no one cared and continued to sell the same deadly poison. When the Fetty Bros suspected someone was cooperating with law enforcement, they tried to kill him and nearly succeeded. When another co-defendant was arrested with their drugs, Co-Defendants O'Mealy and Carr threatened to kill her.

Throughout, the Fetty Bros engaged in additional offenses to build their organization and conceal their crimes. Co-Defendants Carr and O'Mealy, for example, illegally transported immigrants across the border to fund their narcotics purchases from a transnational cartel. The organization even involved a minor in transporting and shipping their Fentanyl-laced drugs and utilized other "Fetty Bros," including Defendant Matthew Gudino-Pena, to act as a security detail for drug shipments. While immersed in this violent conspiracy, the organization amassed numerous firearms, including switches to convert their guns into fully automatic weapons. They also obtained "ghost" guns and offered to sell certain of the firearms obtained during the conspiracy. Then, to conceal their illegal conduct, Co-Defendants Carr and O'Mealy set up a luxury clothing business to launder their drug proceeds.

As it became clear that law enforcement may be tracking them, members of the conspiracy fled to Arizona and attempted to obtain fake identifications to escape to Mexico. While in Arizona, they continued to amass firearms inside a housing complex comprised mostly of college students and located next to the University of Arizona campus. Even after being arrested, members of the conspiracy continued to conceal their crimes. Defendant O'Mealy even solicited a parent, who contacted other members of the organization and directed them to "delete everything."

In sum, Defendant and the drug-trafficking organization to which he belonged engaged in a large-scale-drug-trafficking operation, while endorsing a violent lifestyle, engaging in multiple acts of violence and intimidation. As law enforcement homed in, the organization attempted to obstruct and thwart police from detecting their organization. To mitigate their sentences, Defendant may now ask this Court to focus on his age and lack of maturity. The overwhelming evidence before the Court, however, depicts conscious and thought-out methodologies. The evidence establishes deliberate, bold, and brazen actions, which are apparent in how members of the Fetty Bros organization now view their culpability. A sentence of 17 years for a grown man who attempted to kill a suspected cooperator in furtherance of the conspiracy is necessary to protect the community, punish Defendant for his crimes, ensure a just sentence on behalf of the victims he harmed, and to avoid unwarranted sentencing disparities. A sentence of anything less than that is not justice in this case.

## STATEMENT OF FACTS

The evidence in this case establishes that Defendant and his Co-Defendants relished being part of the Fetty Bros drug trafficking organization, which allowed them to live a certain lifestyle. They traveled throughout the United States to concerts, hotels, and parties. While members of this group used their drug proceeds to fund this lifestyle, their actions – in establishing a business model and distributing drugs throughout the Eastern District and elsewhere – resulted in heartbreak in the communities to which their drugs were distributed. Because U.S. Probation Officer Cassie Lerch's Presentence Investigation Report (PSIR) provides a clear and detailed account of the organization, the facts detailed below primarily address how the conspiracy – like in so many drug cases – affected individual lives and impacted

numerous communities in the Western United States. *See* ECF No. 153 (Gudino-Pena PSIR).[1]

## Overdose Death and Homicide in Northern Idaho

The DEA and USPIS's joint investigation into the Fetty Bros Drug Organization stems from an overdose death and shooting in Northern Idaho. *See* ECF No. 153 at ¶13; Ex. A at pp. 3-18. In May 2021, Idaho State Police responded a call regarding 15-year-old high school freshman in Coeur D'Alene, who was unconscious in his bed. *Id.* at ¶14. Notwithstanding extensive life-saving efforts, the young man was pronounced dead as a result of a Fentanyl overdose. *Id.* During an investigation into that overdose, and based upon review of the teenager's communications, DEA identified Matthew Holmberg as the likely supplier of the fentanyl pills that caused the young man's death. *Id.*

Not long after the overdose, Holmberg and his associate, Dennen Fitterer-Usher, were involved in the shooting death of another victim in Coeur D'Alene, Idaho. *Id.* at ¶15. This victim was found in a pool of blood in the middle of a road with multiple gunshot wounds. *Id.* Text messages confirmed that the victim had arranged to purchase counterfeit oxycodone pills laced with Fentanyl from Holmberg. *Id.* In fact, Fitterer-Usher and Holmberg had traveled to this drug transaction together because the minor was a new customer. *Id.* Both men were armed with a firearm. *Id.* In their text messages, Holmberg and Fitterer-Usher stated they saw the life leave the victim's body and described their attempts to destroy

---

[1] The Offense Conduct sections of the PSIRs for O'Mealy, Carr, and Gudino-Pena are substantively the same. Unless otherwise noted herein, the paragraph numbers cited in this sentencing memorandum could apply to each Defendant's respective PSIRs. Given these similarities, this Statement of Facts generally tracks the recitation of facts in Co-Defendant O'Mealy and Carr's sentencing memorandum. In addition, to the extent helpful, the United States is providing the Court with a PowerPoint (filed under seal) detailing the government's investigation in this case. *See* Exhibit A (non-scannable PowerPoint). The United States anticipates that an edited and shorter version of the full PowerPoint, which previously was provided to the Defense, may presented at the sentencing hearing.

evidence after the shooting. *Id.* Ultimately, Fitterer-Usher admitted they shot the victim inside their car during a drug deal gone bad. *Id.* at ¶16. According to Holmberg and Fitterer-Usher, the victim pulled out a firearm during the drug transaction and attempted to rob Holmberg and Fitterer-Usher. *Id.* At this point, Fitterer-Usher fired, killing the victim. *Id.* When Holmberg and Fitterer-Usher drove away, they left an actual trail of blood on the roadway, caused by the victim's body hanging out of the car while Holmberg and Fitterer-Usher drove away from the shooting scene.

During the investigation into Holmberg and Fitterer-Usher, DEA located the SnapChat moniker of PacMan2021, through which DEA and USPIS identified the Fetty Bros' drug trafficking organization as the primary source of supply to Holmberg and Fitterer-Usher. Among other things, a number of suspicious packages were sent from the same Tacoma post office to Holmberg's home. This was the same post office the Fetty Bros frequented to send other packages containing drugs to Spokane, Alaska, and Arizona. In fact, at the same time one of these shipments was sent Holmberg's address, another package containing counterfeit oxycodone pills laced with Fentanyl was sent to Fairbanks, Alaska. A cooperating source also confirmed that the Fetty Bros drug-trafficking organization had supplied Holmberg and Fitterer-Usher with Fentanyl. This source further confirmed that the Fetty Bros – to include Co-Defendants O'Mealy, Carr as well as Defendant Gudino-Pena and others – obtained large shipments of pills from a transnational cartel.

**The Fetty Bros' Possession and Distribution of Illegal Drugs
in Washington State and Elsewhere**

During the investigation, law enforcement recovered large quantities of various types of narcotics from members of the Fetty Bros Drug Trafficking Organization – narcotics that were seized during vehicle stops, package seizures, the execution of several search warrants, and a controlled buy. *See generally*, ECF No.

153. Photographs of additional illegal narcotics and large amounts of U.S. currency were recovered from the Fetty Bros' social media and Defendant Carr's phone. *Id.* Pictures of just a portion of the narcotics seized in this case or otherwise photographed are included below:





*40,000 pills, 5 firearms, and $16,300 recovered during August 18, 2021 traffic stop*

*June 2021 seizure of narcotics from Tucson Arizona in route to known Fetty Bros contact in Tacoma, Washington*

*SnapChat video depicting additional Fentanyl-laced pills marketed through social media to customers who "Tapn"[2]*

As set forth in the PSIR, the DEA recovered the following amounts of illegal narcotics involved in the conspiracy:

- 5,311.74 grams of Fentanyl included in Defendant's Guidelines Calculations;
- 7,540 grams of Fentanyl that were administratively seized and not included for purposes of Defendant's Guideline Range;
- 254.8 gross weight grams of cocaine;
- 592 gross weight grams of Benzodiazepine; and
- 16.94 gross kilogram weight of marijuana

ECF No. 153 at ¶88.

---

[2] To "tapn" is a way of connecting with another Snap Chat user – i.e., to "hit me up" or to purchase an item that is being marketed through the platform

Of course, these drugs were recovered from just August through September 2021, after the DEA and USPIS identified Co-Defendants Carr and O'Mealy as the leaders of the Fetty Bros Organization. Social media messages and materials from Carr's iPhone demonstrate the Fetty Bros were distributing counterfeit oxycodone pills laced with Fentanyl earlier than that and in far greater quantities than those ultimately recovered during the investigation. *See, e.g., id.* at ¶54.

## Use of Social Media to Smuggle Aliens and Advertise the Sale of Illegal Narcotics and Firearms

The Drug Trafficking Organization not only distributed illegal narcotics in Washington State, their use of social media to advertise and distribute narcotics and firearms further demonstrates how the Fentanyl crisis continues to impact communities throughout the United States. The ease by which the Fetty Bros were able to connect to a transnational drug cartel and the Fetty Bros' ability to easily market narcotics through social-media platforms demonstrates the challenges communities face in their efforts to curb drug abuse and addition. Social media also provides a mass market for drug dealers, such as the Fetty Bros, to easily distribute these deadly pills to our most vulnerable populations – namely our youth.

Notably, the Fetty Bros funded certain of the drug-trafficking operations by smuggling illegal immigrants into the United States. As noted in the PSIR, Co-Defendant Carr used social media to solicit drivers to illegally transport migrants. *Id.* at ¶104. For example, in May 2021, Carr posted, "Need drivers to Tucson!!! Easy money fly in to az my people will get you a hotel and leave with 10k can't make money quick easier then this!" *Id.* at ¶ 52. In another, Carr solicited, "Find someone that wants to change the lives of some pollos and I'll break you off." *Id.* Yet another message specified "come make 10-40k changing the lives of [alien emoticon]." *Id.*

The Fetty Bros did not use social media just to solicit drivers to smuggle illegal aliens. Rather, Co-Defendants O'Mealy and Carr posted a number of

advertisements marketing their products, boasting about the quality of the drugs, their low prices, and the guns[3] they were selling. *Id.* at ¶51. Alongside their advertisements, the Fetty Bros also sent messages via social media and SnapChat glorifying their lifestyle of selling illegal narcotics – depicting large volumes of narcotics and illegal drug proceeds. *Id.* at ¶¶ 52—56; Ex. A at 32.







**Overdose Death in Graham, Washington**

While the Fetty Bros bragged about the quality of their illegal drugs – e.g., describing those drugs as the "best blues," the organization understood the true danger posed by the products they were selling. In fact, in text messages dated June 16, 2021, Co-Defendant Carr specifically acknowledged that people were dying from the Fetty Bros' drugs; yet, he demonstrated no remorse. Instead, as set forth in

---

[3] In their social media depicted here, Co-Defendants O'Mealy and Carr refer to firearms as "straps" and "fishing poles."

the communications below, Co-Defendant Carr offered to continue selling the very same drugs that caused at least one overdose death:

> SKEDD: Why the prices stuck around the 3 area rn? I though AZ and Cali is flooded wit blues rn
>
> CARR: I can get other ones for cheeper they jus not as safe
>
> CARR: I can get some for u for 2 flat but i already got 1 death in graham
>
> SKEDD: Nobody tried to bring that back to u right ?
>
> CARR: nah
>
> CARR: it was a smokr
>
> CARR: itz only when its like someone with a family they care
>
> SKEDD: Nah u dead ass right

ECF No. 153 at ¶54; ECF No. 144 at Ex. 2 (full chat).

**Illegal Possession of Firearms**

The Fetty Bros not only imported and distributed large volumes of drugs in the Northwest United States, they also amassed a large arsenal of firearms during the conspiracy. ECF No. 153 at ¶¶ 84, 86, 93, 96, 99, 101, 115-116. The Fetty Bros' firearms were seized during traffic stops, as well as during the execution of search warrants in Washington State and Arizona. *Id.* By way of example, the firearms and ammunition recovered during the execution of a search warrant of Co-Defendant O'Mealy and Carr's property in Eatonville, Washington are pictured below:

 

Several additional firearms were recovered during the execution of a search warrant of a high-end apartment complex located near the University of Arizona

campus in Tucson, Arizona, where Defendant was staying immediately prior to his arrest. These firearms, which included a so-called a "ghost" gun, were located in a housing complex where a number of University of Arizona students resided. In fact, messages on Co-Defendant Carr's "WhatsApp" demonstrated that the Fetty Bros were seeking to manufacture their own "ghost" guns to include assault-style-type rifles by obtaining a milling machine. There is even a receipt in Co-Defendant Carr's phone for a $2,318 to GhostGunner.net, which markets products for manufacturing firearms "with confidence and ease in the privacy of your own home."[4]

i also will have a consistent supply of ghost ars soon in october i have a milling machine coming in the mail snd we have a russian plug for full auto switches for ars and glocks we csn install

| Participant | Delivered | Read | Played |
|---|---|---|---|
| 5216643615554@s.what sapp.net b | 7/12/2021 12:34:56 AM(UTC-7) | 7/12/2021 12:34:56 AM(UTC-7) | |



*Receipt from Defendant Carr's Phone*    *"Ghost guns" recovered in Arizona*



In addition to the firearms possessed in Arizona, the Fetty Bros routinely video recorded themselves firing fully automatic weapons and posted those videos

---

[4] https://ghostgunner.net/product/ghost-gunner-3-deposit/ (last accessed October 19, 2022).

United States' Sentencing Memorandum for Matthew Gudino-Pena - 10

on social media. Certain of these firearms were equipped with auto switches similar to the ones that Co-Defendant Carr described getting from his "Russian plug" in his "WhatsApp" messages. Defendant Guidino-Pena appears in several of these videos firing the semi-automatic weapons.





*Image from Defendant Carr's snapchat depicting numerous firearms, including with automatic switches*

*Video of Gudino Pena captioned "Fetty mafia shit"*

*Image of Gudino-Pena and O'Mealy firing semi-automatic weapons*

### Attempted Murder of T.M. in Lakewood Washington

Defendant's possession of illegal firearms in connection with the conspiracy culminated in the attempted murder of T.M. on September 25, 2021. ECF No. 153 at ¶¶ 66 – 77. During that shooting, Defendant and Co-Defendant O'Mealy expelled more than more than 40 rounds of ammunition at T.M., striking him in the spine and paralyzing T.M. *Id.*; Ex. A at pp. 47-48 (video of shooting). Evidence establishing Defendant's involvement in that attempted murder demonstrates T.M was targeted because the Fetty Bros falsely believed T.M. was cooperating with law enforcement. ECF No. 153 at ¶ 66-77. Co-Defendant Carr's text messages are particularly callous – expressing that he was "laughing [his] fucking ass off" about the shooting – which indicates a lack of remorse for the Fetty Bros' role in nearly taking T.M.'s life. *Id.* at ¶66. As noted in the parties' pleadings, T.M. suffered a collapsed lung and is paralyzed from the waist down and almost certainly will never walk again. *See id.*

at ¶67. Given the numerous rounds of firearms unleased on T.M., he is fortunate to be alive.




**Efforts to Obstruct Justice and Flee Law Enforcement**

After attempting, but failing, to take T.M.'s life, the Fetty Bros became increasingly desperate. Defendnats Gudino-Pena and O'Mealy left Washington State and traveled to Arizona. *See* ECF No. 153 at ¶95. There, Co-Defendant Carr directed another member of their organization to create fake identities and delete evidence from their phones. *Id.* at ¶¶95, 100, 115. Just days after attempting to kill T.M., the Fetty Bros threatened to kill their co-defendant Jamie Bellovich if she were cooperating with law enforcement. *Id.* at ¶130. Specifically, as set forth in the Plea Agreements and PSIRs, Co-Defendant Carr expressed suspicion that Bellovich was able to get out of jail so quickly after her September 27, 2021 arrest. Carr then stated he would kill Bellovich if she was cooperating. ECF No. 111 at 14-15. Co-Defendant O'Mealy independently stated the same thing – that he would "pop" or kill Bellovich if she were *cooperating*. *Id.* Given the violence the Fetty Bros perpetrated a few days

earlier against T.M., who they also believed was cooperating, the threat on Bellovich was not an empty one.

The Fetty Bros' efforts to thwart law enforcement did not end with their arrest. Rather, Co-Defendant O'Mealy, through his own mother, reached out to a former member of the Fetty Bros conspiracy and a witness in this case to destroy evidence. ECF No. 153 at ¶ 103. While unsuccessful, the Fetty Bros' efforts to threaten witnesses, flee law enforcement, and destroy evidence, demonstrate the brazenness and boldness of the conspiracy as well as the Fetty Bros concerted acts to cover up their criminal activities.

### Nature of the Parties' Plea Agreement

While Defendant's conspiracy extended far beyond the Eastern District of Washington – e.g., the shooting of T.M in Lakewood, Washington and firearms possessed in Arizona – it is significant that Defendant negotiated a global resolution resolving potential charges in Arizona, Western Washington, and Pierce County, Washington. As part of that agreement, Defendant does not face further federal or state exposure for the offenses/conduct set forth in the parties' plea agreements. Accordingly, the sentence imposed in this case need not take into consideration the potential for any additional or separate prison time for elements of the conspiracy that occurred in other jurisdictions. This Court will therefore be able to determine the appropriate sentence that encompasses the totality of Defendant's role in the conspiracy.

### VICTIM IMPACT

The United States has solicited a victim impact statement from T.M., who was shot outside a recording studio in Lakewood, Washington in September 2021 referenced above. Assigned counsel contacted T.M's attorney to request a meeting to obtain material relevant to restitution and a victim impact statement. T.M. conveyed the gravity of how his life has been changed forever as a result of his

paralysis. The damage to T.M., however, is not just physical. Rather, the shooting and paralysis has had a significant impact on T.M.'s mental health. He advised that he is still struggling with the simple practicalities of living with his disability. T.M. stated he is trying to go on with his life and did not want to discuss the Fetty Bros organization. While T.M. likely will never walk again, he is grateful for his life. He indicated the people who shot him should be punished for the shooting and reiterated that the Fetty Bros falsely and mistakenly accused him of cooperating with law enforcement. T.M. made clear he was never a cooperator, which is consistent with the evidence. The United States has found no evidence to support the Fetty Bros paranoid fear that resulted in retaliation against T.M.

## SENTENCING CALCULATIONS

The government agrees with U.S. Probation that Defendant Gudino-Pena's total offense level is 35, criminal history category is I, and the guideline range is 168-210 months. Defendant faces a period of up to a lifetime supervised release and the applicable Guideline Range is 5 years' supervised release.

## SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In determining the appropriate sentence, this Court should consider the factors as set forth in 18 U.S.C. § 3553(a). Based on these factors, the United States respectfully asks the Court to sentence Defendant Gudino-Pena to a term of 204 months, followed by a 10-year term of supervised release.

1. <u>The nature and circumstances of the offense</u>

While it's difficult to compare the unique facts and circumstances of one case to another, Defendant engaged in a gravity of conduct that is hard to reconcile. Although the consequences of large-scale drug distribution are apparent in many cases, this case in particular presents egregious violence, use of the mail to distribute drugs, firearms trafficking, threats, and obstruction of justice. *See generally* Ex. A. The charged conspiracy involves distribution of 400 grams or more of Fentanyl;

however, the relevant conduct extends far beyond – all off which started though social media. As noted herein, the nature and circumstances of this offense are as serious as this Court faces.

While not a leader or organizer in the conspiracy, Defendant Gudino-Pena had a clear knowledge of the breadth of the conspiracy and its potent violence. Defendant was armed in August 2021 during a traffic stop in which 40,000 Fentanyl-laced pills were seized. He also participated in other supply trips from Washington to California and Arizona. He even carried a gun with him to Arizona as the Fetty Bros plotted an escape to Mexico. What is most troubling, however, is that Defendant Gudino-Pena senselessly engaged in the tragic shooting of T.M. in September 2021. That this Defendant would attempt to murder a suspected cooperator demonstrates that he would stop at nothing to preserve the Fetty Bros organization and lifestyle this organization afforded. For his role in the conspiracy, a sentence of 17 years is appropriate.

2. History and Characteristics of Defendant

Like his Co-Defendants, the severity of Defendant Gudino-Pena's actions is extremely concerning. These are actions that age alone do not outweigh. The United States is cognizant that Defendant is 21 years' old and has no appreciable criminal history, other than acts that are a part of the overall criminal conduct here. That said, Defendant Gudino-Pena does have a number of arrests for serious offenses, including firearms possession and burglary. ECF No. 153 at ¶¶152-159. This case is not Defendant's first run-in with the law. Accordingly, when the Court assesses the extremely aggravating nature of this conspiracy, arguments regarding his age and immaturity lose their impact.

Youthful indiscretion is one thing, but this behavior stretches far beyond – especially given that lives were lost and forever impacted by the Fetty Bros callous, boastful, and repeated violent conduct. Defendant Gudino-Pena was very much part

of that. Given the harm inflicted by Defendant and the scale of the conspiracy in which he took part, a sentence of anything less than 17 years is not appropriate.

> 3. <u>The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and protect the public.</u>

The Fetty Bros conspiracy wreaked havoc upon various communities, and the organization, at least up to this point, does not appear to appreciate the seriousness of the harm the Defendants caused.

Defendant Gudino-Pena's role in assisting with the sale of Fentanyl-laced pills had a significant impact on this community even apart from the impact on the direct victims in this case. Fentanyl is the new face of the opioid epidemic and the leading case of overdose deaths across the country. According to the DEA, in 2021 there was enough lethal Fentanyl seized to kill every single American in the United States.[5] Based upon DEA lab confirmation, 2 in every 5 Fentanyl-laced pills may contain a lethal dose. Locally, Department of Health records from Spokane County, show over an 186% increase in fentanyl-related overdoses between 2020 and 2021 and a 1233% increase in Fentanyl-related overdoses in the four-year period between 2017 and 2021.[6] In determining its sentence in this extremely serious case, this Court can communicate the significance of Fentanyl distribution and convey a message that hopefully resonates with users and distributors alike to help prevent the continuous flow of this deadly drug into our communities and raise awareness of its impact.

---

[5] *See* https://www.dea.gov/resources/facts-about-fentanyl; https://www.justice.gov/opa/pr/department-justice-announces-results-enforcement-surge-reduce-fentanyl-supply-across-united; https://www.dea.gov/press-releases/2021/12/16/dea-reveals-criminal-drug-networks-are-flooding-us-deadly-fentanyl.

[6] *See* https://doh.wa.gov/sites/default/files/2022-02/wa_lhj_quarterly_report_18_1_2_pub.html#1_Overdose_Mortality.

The Fentanyl crisis has devastated communities in the Northwest United States, leaving families grieving for their loved ones. Yet, the Fetty Bros callously noted that these deaths do not matter to them – e.g., when Co-Defendant Carr says, "No, it was a smokr. Itz only like family when they care." ECF No. 153 at ¶54. After T.M.'s shooting, in which Defendant Gudino-Pena played a critical part, Co-Defendant Carr remarked, LMFAO – meaning, "laughing my fucking ass off." *Id.* at ¶66. This horrifying response to the realities of drug and firearms distribution further demonstrates the need for a sentence that promotes respect for the law and provides justice to Defendant's victims – both known and unknown. A 17-year sentence for what Defendant actually did is appropriate. Such a sentence is also necessary to keep the community safe from Defendant's further crimes.

   4. <u>The need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct</u>

The best way to ensure consistent sentences for similarly-situated defendants across courtrooms, districts, and the country is for courts to apply the sentencing Guidelines in the same manner everywhere. *See United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007); *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006); *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). The Guidelines are the only normative way to accomplish that. In this case, a Guidelines sentence of 204 months properly accounts for "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Numerous courts have recognized that sentencing within the Guidelines range serves as a bulwark against unwarranted sentencing disparity. *See United States v. Guerrero-Velasquez*, 434 F.3d 1193, 1195 n.1 (9th Cir. 2006) (recognizing that guidelines "help to maintain uniformity in sentencing throughout the country"); *United States v. Hunt*, 459 F.3d 1180, 1184 (11th Cir. 2006) ("The Guidelines . . . are an indispensable tool in helping courts

achieve Congress's mandate to consider 'the need to avoid unwarranted sentence disparities' among similarly situated defendants") (quoting 18 U.S.C. § 3553(a)(6)); *United States v. Smith*, 445 F.3d 1, 7 (1st Cir. 2006) (noting that "the guideline range . . . is the principal means of complying with" the goal of avoiding unwarranted sentencing disparity).

The Ninth Circuit has specifically observed that a sentence consistent with the guideline range is unlikely to be disparate because such a sentence "represents the sentence that most similarly situated defendants are likely to receive." *United States v. Becerril-Lopez*, 541 F.3d 881, 895 (9th Cir. 2008). Thus, mindful that the Guidelines must be "the starting point and the initial benchmark," *United States v. Carty,* 520 F.3d 984, 991–92 (9th Cir. 2008), the United States submits that a guideline sentence of 204 months will avoid unwarranted a significant sentencing disparity and is appropriate in a case where Defendant attempted to kill his victim.

Notably, the United States recommends a sentence for Defendant Gudino-Pena that is three years less than the recommended sentence for his Co-defendants Hunter Bow O'Mealy and Caleb Ryan Carr. While Co-Defendants O'Mealy and Carr had more of a leadership role in the organization and in the distribution elements of the conspiracy – warranting a higher recommendation than Gudino-Pena – Defendant nonetheless took part in one of some of the most violent acts perpetrated in furtherance of the conspiracy. Accordingly, the government recommends a sentence of seventeen years followed by ten years of supervised release.

### GOVERNMENT'S SENTENCING RECOMMENDATION

The government recommends the Court impose a sentence of 204 months of imprisonment and a ten-year term of supervised release. Although this is lengthy sentence, it is within the applicable Guidelines Range, as determined by U.S. Probation. Given Defendant's violent role in the conspiracy, seventeen years is appropriate in this case.

Respectfully submitted this 19th day of October 2022.

Vanessa R. Waldref
United States Attorney

*s/ Richard R. Barker*
Richard R. Barker
Assistant United States Attorney

*s/ Stephanie Van Marter*
Stephanie Van Marter
Assistant United States Attorney

## **CERTIFICATION**

I hereby certify that on October 19, 2021, I electronically filed the foregoing with the Clerk of the Court and counsel of record using the CM/ECF System.

*s/Richard R. Barker*
Richard R. Barker
Assistant United States Attorney